2013, 5049. Mr. Eggers. Mr. Walter Eggers, on behalf of the Appellate WYODAK Resources. The legal issue in this appeal is the proper interpretation and application of the payment and rate statute for coal reclamation fees. That statute on 30 U.S.C. 1232a sets the reclamation fee rate based on the geologic type or the rank of the coal subject to the fee. The statute sets a general fee for various types of coal, such as continuous coal and for site. But then separately, specifically, sets a lower rate for lignite coal. The statute uses the term lignite and that's significant to the proper interpretation of the statute. Now, isn't it true that you paid the higher fee for years and years and years without making this argument? Yes. 26 years? That's correct. All right. And why was your interpretation of the statute not reasonable during that entire 26-year period? WYODAK Resources did not engage in the in-situ study of its coal reserves until 2005. It was only at that point that it had the information it needed to go to the Office of Surface Mining and make its both refund claim and its claim going forward that the lignite found in the ground at WYODAK, which everyone conceived exists, should be taxed at the lower lignite rate. There is no dispute that there is an identifiable quantity of lignite at the WYODAK mine. But what was extracted was not mostly lignite, only a small amount of lignite. That's correct. Approximately 12.3% of the mineral at the WYODAK mine qualifies as lignite coal. And the BTU level of what was extracted was well below the lignite definition? It was above the lignite definition. That's correct. The problem, the situation that is created by the OSM's position in this case is basically an all or nothing proposition. If you've got recognized quantity of lignite in the ground and you produce it with a recognized quantity of sub-petuminous coal, as in WYODAK's case, and if the sub-petuminous coal happens to outweigh the lignite, then the government's position is that it's all taxed as though it's sub-petuminous coal. And that's just simply inconsistent with the statute which sets a separate rate for lignite and OSM's own regulations which set a separate rate for lignite and recognize and define lignite as an independent separate rank of coal. I suppose even if the lignite outweighed the bituminous, let's assume a way sub-bituminous, but the BTU rating was higher than A300, the government's position would be that's treated as bituminous even though bituminous is a minority of the coal? I believe that's exactly right. I guess I should ask them rather than you, but that's your understanding of their position. That is my understanding of their position, and basically what we have in this case is the agency OSM reading the statute as though it says if the coal produced is below a certain BTU content, then it is subject to the lower reclamation fees. If it is above the BTU rate of say A300 per pound, then it is subject to 100% at the higher rate. And that is just simply inconsistent with the way Congress designed this statute. It's clear, we've got citations in our brief to the congressional background that the legislative process, the legislative statute, there were proposals that the statute would just be based on a BTU value. And if that were the case, we would not be here today. Likewise, Congress could have decided that all coal, all ranks of coal is subject to the same rate. What about the statute of limitations? The court of federal claims ruled in favor of the government on the five-year statute. And you're not appealing? And we're not appealing. So your appeal, I take it, is only six years back? That's correct. All right. Let me ask you this. The regulations, the elaborate set of regulations here, and there's some allusions in the briefs to deference at least to the interpretation of the regulations. What has been, is there any historical interpretation of the regulations in a manner consistent with the position taken by the government in this case? Or is this the first time the regulations have been interpreted in the manner that was argued to the court of federal claims? Or is there anything in the record to that effect? Well, there is a very clear administrative record in the record on appeal. Okay. And that's significant. What happened in this case is the OSM, both through two audit reports and also its ruling on WIODAC's refund claim, determined that, and this is back in the 2006-2007 time frame, determined that the point for determination of lignite was at the point of sale, not at the point of extraction, not at the point of production, but at the point of sale. That was the administrative decision that we contested both first through the administrative channel and then in the district court of WIODAC. That position, that the point of sale is the determination point for lignite, was soundly rejected by this court in its line of cases named consolidation of coal. In 2008 and 2010, this court made very clear that extraction, that coal produced means coal extracted, not coal sold. Although I gather that is not the position taken by some other courts. I take it that our position has not been unanimously accepted elsewhere. Is that correct? I am not familiar with another court taking a position on that. It doesn't really matter, but I'm just, whether that's a hard and fast rule or not is, I guess, open to questions. Well, what's significant, Your Honor, is that you asked about the administrative consistency on this issue. And quite frankly, the administrative decision, which was the subject of this case from the beginning, was overturned by this court. And it was not until we proceeded through the District Court of Wyoming, the 10th Circuit, and into the Court of Federal Claims, that the government, OSN, has now changed its position to take the position that there is a new category of coal. And that category is blended coal. Right, so they're not asserting point of sale at this point in time. No, no. I believe they acknowledge your ruling in consolidation of coal. Instead, what they've decided now is that in order to tax WIODAC as the 100% of its coal subpoenas, that it will take the position that there is a category of coal, blended coal, or homogenized coal. And if that blended coal falls below 8,300 BTU per pound, then you qualify for the lignite rate. And if it's above 8,300 per pound, then you must pay as the 100% of your coal is not lignite. Now, this position with respect to blended or homogenized coal, does this appear only in the briefs in this litigation, or has this been something that's been articulated by the agency in some non-litigation context, to put it that way? I'm not aware of OSN outside the context of this case. You understand where I'm going, but this is our problem. I mean, is this an agency interpreting its own regulations, or the other side of that somewhat fuzzy line, as the Supreme Court has defined it. Is this just an agency taking a position for the convenience of litigation? The first gets a lot of deference. The second does not. It would be our position that the agency's determination is entitled to no difference in this case, because its interpretation has changed throughout the case. I mean, it's clearly a position that is taking the course of litigation, because it's different than the original audit report that we initially contested. When you talk about the legislative history behind the statute, is the focus of the statute differentiate between the method of production, or was it to encourage the mining of low-energy coal? Your Honor, I believe if we walk through the legislative history that led to this statute, the intent in the addition of the lower lignite rate was a recognition of two things. First of all, that the lignite coal has a lower BTU value, and so, as in this case, the value of the coal to the producer is lower, and therefore it would be equitable to tax that producer at a lower rate. There's also information in the legislative history of a recognition of the difference in coal properties across the country. There is change, even in Wyoming, as you go through the Powell River Basin, you have a different quantity of lignite coal, geologically, through the basin. And so, there is a distinction between these two types of coal that's reflected in the statute and in the regulations. I need to underscore the importance of the use of the term lignite. That is a geologic type of coal, it is a geologic rank of coal, which is understood by geologists, but also Congress took the additional step of defining lignite, not only to recognize that the lignite has a BTU value less than 8300, but also meets the other properties of lignite coal. Consolidated, lignitic, mineral moisture free, and meeting the BTU requirement. What does consolidated mean in the context of this case? Because if we're looking at it after it's been extracted, presumably it's not consolidated in the lay sense of the term. That's exactly right, and we believe that supports the recognition by Congress that some form of in-situ testing of the quantity of lignite in the ground should occur. That's also reflected in the administrative regulations, we believe, when they cite to the ASTM standards for ranking of coal. If Congress recognized that, then why wouldn't we see anything where they at least discussed in the legislative history how to go about making that determination? Your Honor, we believe that Congress left that determination for the rulemaking process conducted by OSM, and they did. They referred to the ASTM standard for the determination of coal rank. We believe that it was a decision that, yes, we're going to define lignite as having these qualities, and then leave it to the agency to describe how that's going to occur. They did so in their rule through reference to the ASTM standard. It looks to me as if you would have a much better idea than I on this, but from looking at the legislative history, it looks to me as if Congress simply overlooked the possibility that certain mines would have both types of coal, or multiple types of coal, and they were dealing with the assumption that a mine would have lignite or it would have some other type of coal, period. Is that a fair assumption given the way the statute is written? The statute does not advert to the situation that arose here where you have a mixture as it comes out of the ground. That is correct. The statute does not refer to blended coal or combined coal or anything of the sort. What it says very clearly is if there is lignite produced, that lignite is taxed at a lower rate. Your Honor, I believe there's authority for an assumption by the court that Congress was aware of the current situation, the current fact, when it passed a statute that differentiated between lignite and other types of coal. Do you happen to know, and this is, I looked here for probably extra record, but looking at your expertise in the area, do you happen to know how common it is for mines outside of your client's properties to have mixtures of different types of coal? Is that a once in a while, once in a blue moon, or all the time situation? Your Honor, I don't believe it is beyond the record. I think we do have evidence in the record that at least in Wyoming, in the Powder River Basin of Wyoming, there is a transition as you trend northward through the basin for increased lignite and lowered subterranean coal. My response to you would be I believe that most mines have some form of combination. Mr. Regus, your rebuttal time has just about been exhausted, but we'll give you a minute. Thank you. Is it Ms. Ely? Thank you. Ely?  Ely. Thank you, Your Honor. May it please the Court. WIADAC does not produce lignite coal, and for that reason, it is not entitled to avail itself of paying reclamation fees at the lignite rate. Let me ask you a question right off the bat that has been troubling me about this case. Suppose that WIADAC used the old-fashioned method of extracting coal, miners with pickaxes, and they brought out coal, let's say three carts of subbituminous and then one cart of lignite. Then three carts of subbituminous and one cart of lignite. And they had somebody there who was keeping track of the number of carts of subbituminous and the number of carts of lignite. Presumably, you would agree that in that situation, they would pay the lignite rate for the lignite carts and the higher rate for the subbituminous carts, right? Yes, Your Honor, we would agree with that. And if, even to carry it one step farther, some of the carts had chunks of coal that were lignite and other chunks that were subbituminous, and the fellow that's sitting there looking at it and keeping track tosses the lignite into one cart and the subbituminous into another cart. Same result, right? They pay for the lignite at the lower rate, the subbituminous at the higher rate, right? If that's the matter, it's extracted. Right. But how can it make a difference? If you have a mixture coming out of the mine, how can it make a difference to the outcome, to what the size of the particles is? Here we have small particles that would be impossible to separate when they get to the surface. But presumably they were separated when they were down in the mine, and in any event, it's a combination. There's no chemical reaction. It's just a combination of lignite and subbituminous. Why isn't the same result as with the large chunks? Well, this court has appropriately focused in the consolidation of coal cases on what the characteristic of the extracted product is. And because, in essence, the reclamation fee is a tax, and I realize the term tax probably shouldn't be used in that context, but they see this based on the act of extraction. So the point is to look at what the act of extraction produces. And so in this case, you have someone—it's basically the equivalent of having someone who makes a brick saying, oh, no, no, no, it's really—my product is not a brick. It looks like a brick, smells like a brick, but it's really just water and sand. Let's look at the water and sand and the components of it. In this case, what Wyatt asked— I want to bring you back to my question, though. What's the difference between a cart that has chunks of lignite and chunks of bituminous, which presumably you could say, you know, a third of the cart is lignite and two-thirds of it is subbituminous, and you charge the tax to the lignite chunks at a lower rate than to the subbituminous. What's the difference between that and the mixture that we have at issue here? Well, Your Honor, the world really is—was set up by Congress within the context of the Surface Mining Control and Reclamation Act as a binary world. On the one hand, there is lignite. On the other hand, there is all other types of coal. And the reality is— Is your answer that when it comes out of the mine, the lignite is combined with the subbituminous physically? Yes, it's physically combined, Your Honor. And what proper testing, in situ or otherwise, would produce would be an average value that would characterize the extracted product as a whole. And simply in the manner it's extracted, this product does not meet the regulatory definition of lignite. And for that reason, they're not—this coal company, this mining operator, does not fall within the narrow class of mining operators that are genuinely economically— Are you saying—is the question, as Judge Bryson was hypothesizing, picking out the lignite and separating it, that it takes some sort of physical separate—or maybe even a chemical—but some sort of processing to separate them? Is that a fact? I don't think that they ever are—I'm sorry, maybe I don't understand your question. There's currently one method of extraction, which is blasting only. And I suppose Judge Bryson was questioning me about what he termed the old-fashioned way, which is the pickaxe method. My understanding is that there's currently not a method—a post-blasting method that could be used to— Well, this court has said that what needs to be looked at is the extracted product. And the extracted product really is key here. In this case, their extracted product does not place them within the category economically disadvantaged mining— But it seems to me you're turning the inquiry into a one-part test, which is the BTU level. Suppose, for example, that the product was actually 55% lignite. It's a mixture, but we learned that 55% of it is lignite and 45% of it is bituminous, but the BTU level is above the 8,300 level. How would you treat that? If it's above the 8,300, then it is not lignite. Okay, so no matter how much lignite is in the product that comes out of the ground, it's not lignite. Correct. So you've got a one-part test, right? It's just the BTU level. No, Your Honor. It's larger than that. It's also a moist mineral matter framework. Okay, but set aside the mineral and moisture. And the consolidation point is something of a red herring in the sense that any piece of coal that comes out of a mine and is in rock form is going to be consolidated. Unconsolidated matter is something like P. So any particle that comes out of the mine is going to be consolidated within the rubric of the definition the plaintiff has put forward. So there's really no magic to particle size. The reality is that the regulation also defines a binary world, lignite and non-lignite. 30 CFR 870.5 defines anthracite, bituminous, and subbituminous coal as all coals other than lignite coal and then offers a specific lignite definition. But that definition is the same as the statutory definition, except for the use of the term lignite instead of lignitic. There's no significance to that. Correct. There's no significance to that difference. Oh, no, you're wrong. And the reality is that both the statute and the regulation and the legislative history reflect a binary view of the world. If it is disadvantageous to WIAT Act, they've certainly made some policy arguments that they are disadvantaged relative to other coal producers due to the quantity of lignite. The remedy lies with Congress to address the blended BTU issue, if that's truly an issue. But if everybody understands that when you do coal blasting, you end up with a blend, wouldn't Congress have understood that as well? And maybe they would have if they had wanted to say only if it's solely lignite, not blended with anything else. I mean, wouldn't it have made more sense for Congress to say that if they wanted the result, this binary result that you're talking about? Well, I think it would be safe to assume that Congress would have had some understanding of blasting. But the legislative history that has come forward really only couches the discussion in terms of what kind of coal producer would be disadvantaged or harmed and needs to pay a lesser reclamation fee because they sell a cheaper, less valuable type of coal. So Congress was really focused on a different issue and made a judgment that only a narrow class of coal producers. The judgment that Congress made was that for purposes of reclamation and restoration of abandoned mine lands, that coal producers share and share alike, except for a very narrow defined class of individuals that sell lignite coal and might have trouble paying. Is there still a class of individuals that sell only lignite coal? Yes, there is. And how big a class is that? I don't know how big it is. My understanding is that it's producers that mine the lignite and almost immediately shunt it into a power plant on or near the coal grounds because it's not economically viable or advantageous to transport low value lignite over long distances. Then once it's shunted to the coal mine, it's combined with other things? I don't know if it's combined. It's sort of like a direct mine-to-mouth operation. I might have the term somewhat wrong, but the idea is that low value lignite is almost immediately used and is not transported or sold or entered the marketplace in the way that other coals do. That's my understanding. It's sort of an extra record. I take it that that type of lignite would still have to satisfy the requirement that it be predominantly lignite, even though the BTU level was below 8,300 or not? Suppose you had something which was predominantly not lignite but had a lot of lignite in it and was below the 8,300 level. How would you treat that? The way that testing works, in situ or otherwise, is to take an average value. Testing that is truly in conformance with ASTM standards, and this is something we addressed with the trial port and the trial port did not reach, but testing that is truly in conformance with ASTM standards will basically take core samples from the bottom of the mine to the very top across a wide area, and it produces an average value for the entire mine. The point is that you would be characterizing the product as a whole, not looking at it to see whether it's predominantly one type or the other. It's really not a question of parsing a theme into particular components. It's to get an average value. So if the average value went across the mine and you discovered that the mine actually produced 55% lignite and 45% bituminous, but the BTU level was below 8,300, would that be lignite? Yes, it would if considering it across the whole mine. And if the BTU level was above 8,300, it would not be lignite, correct? No matter how much lignite was in it after the testing of the percentage? In theory, yes, but I think that at a certain point when you get such a high proportion of lignite, you're dealing with an impossibility, probably. If you have 95% lignite, I don't think it's very likely that the mine ranks up by 2%. Is the point about the statutory definition that coal producing less than 8,300 BTU is less valuable because you want heat output and therefore the tax is less? Is that the point? That's the case, Your Honor. Even though this court announced appropriately in the context of consolidation of coal that this is a tax on extraction, that doesn't mean that Congress didn't appropriately consider the economic impact of the state. And there's ample evidence that it did in this case, again, focusing on the narrow class of disadvantaged producers who sell lignite. Let me ask you the same question I asked Ms. Dragers about the hour issue, A-U-E-R. About the hour? The case that says that you defer to the agency's interpretation of regulations, but not when it's a position taken in the course of litigation. When did this position of the agency with respect to the mixtures, the homogenized coal produced, when did that first emerge? Yes, Your Honor. I think I want to address that. I do want to address that. I think that it is true that this was announced for the first time in this litigation in light of developments in consolidation of coal. But we are not arguing for a result based upon deference to the agency's interpretation. That's going to be my next question. You're not asking us to give Chevron our deference to anything that happened. This is a straight up, up and down statutory construction case. Yes, Your Honor. That's the case. Because we rely on the definition of lignite on the one hand within 30 CFR 870.5. The regulation says all coals other than lignite coal, that means all ranks, all grades, everything that's not lignite, it ends up falling into the bucket of reclamation fees that is one of the two higher rates. So, we're not arguing for an agency interpretation. I think that to the extent we mentioned some of those cases, it was in the context of the plaintiff's allusion to the Black Long Jacks Act. But for purposes of the actual outcome in this case, we're just relying on the statute, the regulation, and pointing out that with respect to the legislative history of the Wyatt Act, there's simply no reference to this sort of sliding scale of reclamation fees. I mean, there would be a fee change in the system, and there would be at least one clear reference in the legislative history, and there is not. You say that the IRS interpretation isn't binding, but you don't really explain why it's wrong. You just simply think they got it wrong and you got it right? No, Your Honor. Well, obviously it's a different statute, but there is a specific treasury regulation that was written for the purposes of the statute, and there's no equivalent one in the SMACRA, I guess, pantheon of regulations. I mean, the treasury regulation for purposes of the Black Long Jacks Excise Tax, which was relied on by the IRS body that addressed Wyatt Act's claims in that other proceeding, the treasury reg said if a producer extracts both taxable coal and lignite, then the producer must maintain adequate records to establish the portion of the mineral that is exempt from tax. There's no equivalent regulation that could be colorably interpreted the same way in the SMACRA, on the SMACRA side of the books. And so for that reason, even if the opinion had been precedential for purposes of the IRS, which it was not, it couldn't inform the interpretation of the SMACRA regs. They're just completely different for reasons that have to do with Congress and different agencies, I presume. Thank you, Ms. Ely. We'll give Mr. Eggers a minute to respond. Why am I not arguing for a sliding scale of Reclamation C, as the government contends? What we're asking the court to rule is that the language in the statute controls. And the language in the Reclamation C rate statute says that lignite shall be taxed at a lower rate. That's not occurring here because the government's position is that if 100% of the coal exceeds 8,300 BTU per pound, then they tax 100% of the coal as if there is no lignite at the mine. That is incorrect as a matter of law. No matter what the actual percentage of lignite. Exactly. Exactly right. And frankly, there was a suggestion that why an act of remedy is with Congress. Frankly, our position is the statute is very clear, could not be more clear and could not use more definite language about the taxation of lignite. We would ask the court to reverse the trial court's summary judgment on the issue of the statutory construction and remand with instructions to recognize the in-situ testing and move to the question of the regulation on testing. Thank you, Mr. Eggers. We'll take the case under advisement.